O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | |
|---|---|---|
| Stephen Montes | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:         Attorneys **NOT** Present for Defendants:

**Proceedings:**         IN CHAMBERS (No Proceedings Held)

## I.   INTRODUCTION

Plaintiff Everpure, LLC ("Everpure") sued Defendant Selecto, Inc. ("Selecto") for infringing United States Patent Number 7,294,262 ("the '262 patent"), which covers a modular fluid treatment apparatus.

The parties disagree about the correct construction of four different terms in claim one of the patent. The Court received and reviewed two sets of briefs from each party and conducted a several-hour *Markman* hearing on April 9, 2010. In addition, the Court received and has reviewed supplemental briefing from each party.

## II.   THE CLAIM AT ISSUE

Claim 1 of the '262 patent is reproduced below, with the disputed terms underlined:

> 1.  A modular fluid treatment system comprising:
> a first <u>fluid</u> <u>treatment</u> <u>module</u> having a first head; and first, second, and third fluid ports on the first head, each of the fluid ports on the first head providing connection locations to which the first head can be connected to at least one other fluid treatment module;
> a second <u>fluid</u> <u>treatment</u> <u>module</u> having a second head; and a first fluid port on the second head; and
> a <u>first</u> <u>connector</u> and a <u>second</u> <u>connector,</u> <u>each</u> <u>being</u> <u>removable</u> <u>and</u>

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

interchangeable, each configured to couple the first <u>fluid</u>
<u>treatment module</u> to the second <u>fluid treatment module</u>, <u>the first</u>
<u>connector defining a parallel flow configuration, the second</u>
<u>connector defining a series flow configuration;</u>
the first head having a first orientation with respect to the second head
in which the first fluid port for the first head is in a first
connection location and in which the second fluid port is in a
second connection location; and a second orientation with
respect to the second head in which the third fluid port of the
first head is in the first connection location and in which the
second fluid port is in a third connection location, <u>the first</u>
<u>orientation</u> and <u>the second orientation each allowing both</u>
<u>parallel flow and series flow with the second head.</u>

Tadlock Decl., Ex. 1 ("Patent"); Col. 19:49-20:5. According to the Patent, the device is
designed to be a fluid treatment system, wherein the system components (such as filters)
can be easily interchanged due to a modular design. *See* Patent at Col. 1:6-27.

## III. PRINCIPLES OF CLAIM CONSTRUCTION

The court, not the jury, must construe the meaning and scope of patent terms.
*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc),
*aff'd*, 517 U.S. 370 (1996). In construing disputed claim terms, the court should look
first to intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582
(Fed. Cir. 1996). Intrinsic evidence includes the language of the claims, the specification,
and the file history, if in evidence. *Id.* The claims themselves are of "primary
importance, in the effort to ascertain precisely what it is that is patented." *Phillips v.
AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The "words of a claim 'are generally
given their ordinary and customary meaning.'" *Id.* The "ordinary and customary
meaning" of a claim term is judged from the perspective of a person of ordinary skill in
the art. *Id.* at 1313.

Such a person "is deemed to read the claim term not only in the context of the
particular claim in which the disputed term appears, but in the context of the entire patent,
including the specification." *Id.* "Consistent with that general principle, . . . the

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* The Federal Circuit emphasized in *Phillips* that "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). A specification need not define a term expressly in order to be a useful reference. It may also define terms by implication. *Id.* at 1321 (citing *Vitronics*, 90 F.3d at 1582).

On the other hand, one of the "cardinal sins" of patent law is reading a limitation from the written description into the claims. *Id.* at 1320 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). This problem often arises when a patent describes only a single embodiment. In that case, it is not required that the claims of the patent be construed as being limited to that embodiment. *Id.* at 1323. *See also Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1332 (Fed. Cir. 2007) ("Even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope . . . ."); *Intamin, Ltd. v. Magnetar Techs. Corp.*, 483 F.3d 1328, 1333 (Fed. Cir. 2007) ("a narrow disclosure in the specification does not necessarily limit broader claim language"). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* at 1323.

The Federal Circuit has also instructed district courts to look to the patent's prosecution history. Although the history "often lacks the clarity of the specification," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317.

In most situations, analysis of this intrinsic evidence alone will resolve any ambiguity in a disputed claim term. *Vitronics*, 90 F.3d at 1583. However, extrinsic evidence "may be considered if the court deems it helpful in determining the 'true meaning of the language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

*Markman*, 52 F.3d at 980). Extrinsic evidence refers to evidence that is external to the patent and its file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. *Vitronics*, 90 F.3d at 1584. Although generally "less reliable than the patent and its prosecution history," the Federal Circuit has "noted the help that technical dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms." *Phillips*, 415 F.3d at 1318. Accordingly, courts may freely consult dictionaries and may rely on dictionary definitions when construing claims, to the extent the dictionary definition does not contradict a definition found in the patent documents. *Vitronics*, 90 F.3d at 1584 n.6. Similarly, although "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court," such evidence is "useful . . . for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. A court, however, "should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Id.* at 1318 (quoting *Key Pharms. v. Hercon Labs. Corp.,* 161 F.3d 709, 716 (Fed. Cir. 1998)).

"While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 -27 (Fed. Cir. 2006).

Finally, although the Federal Circuit has "acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction." *Phillips*, 415 F.3d at 1327. Rather, the maxim is limited to cases in which "'the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous.'" *Id.* (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|----------|------------------------|------|--------------|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

## IV.   ANALYSIS

### A.   "Fluid Treatment Module"

The following chart contains both parties' interpretations of the disputed term "fluid treatment module."  Patent at Col. 19:50, 55, 59-60; Col. 20:7, 44-45, 50-51, 56-57, 62-63.

| Everpure's Interpretation | Selecto's Interpretation |
|----------------------------|---------------------------|
| Any in a series of standardized units for use together, for treating or processing fluid or for moving or controlling the flow of fluid. | An assembly including a head that is fluidly coupled to a cartridge that alters the characteristics of a fluid passing through the cartridge in the same way regardless of the direction in which fluid flows through the cartridge. |

The Court adopts Everpure's interpretation of the term "fluid treatment module." Everpure's interpretation rests soundly on intrinsic evidence, whereas Selecto relies on extrinsic evidence that impermissibly contradicts the specification.

The specification clearly states, "[A]ny device employed for treating or processing fluid of any type, or for moving or controlling the flow of fluid can be employed as a cartridge in each module." Patent at Col. 7:44-47. This contradicts Selecto's interpretation that the module must "alter[] the characteristics of a fluid passing through the cartridge," which is based upon extrinsic evidence, namely the testimony of Selecto's expert, John Tadlock, and a dictionary from the Water Quality Association. Tadlock Decl. ¶ 11, Ex. 2. A Court may not rely on extrinsic evidence when it contradicts intrinsic evidence. *See Vitronics*, 90 F.3d at 1584 n.6; *Phillips*, 415 F.3d at 1318.

Furthermore, the specification, in combination with the testimony of Everpure's expert, Peter Cartwright, demonstrates the flaw in Selecto's construction that the cartridge must "alter the characteristics of a fluid passing through the cartridge *in the same way* regardless of the direction in which fluid flows through the cartridge." (emphasis added)  The specification lists a number of various fluid treatment devices that

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

can be used as cartridges in each module, including "filters."  Patent at Col. 7:39.
According to Mr. Cartwright, a filter does not always treat fluid in the same way
regardless of the direction in which the fluid flows through it.  Cartwright Reply Decl. ¶¶
6-7.  The efficiency of a filter is diminished when flow is reversed through it, so a module
using a filter as its cartridge—as contemplated by the specification—would treat fluid to
a lesser degree—not in the same way—when flow through the cartridge is reversed.  *Id.*
This is additional evidence that Selecto's interpretation of the term "fluid treatment
module" is not grounded in the Patent.

        In contrast, Everpure's interpretation is based upon language found in the
specification.  *See* Patent at Col. 7:44-47.  Thus, the Court adopts Everpure's
interpretation and finds that a "fluid treatment module" is "any in a series of standardized
units for use together, for treating or processing fluid or for moving or controlling the
flow of fluid."

### B.     "A First Connector . . . Being Removable and Interchangeable . . . Defining a Parallel Flow Configuration"

        The following chart contains both parties' interpretations of the disputed term "a
first connector . . . being removable and interchangeable . . . defining a parallel flow
configuration."  Patent at Col. 19:57-62; 20:55, 61.

| Everpure's Interpretation | Selecto's Interpretation |
|---|---|
| One or more structures that (a) are capable of connecting one component of a fluid treatment system to another component of a fluid treatment system, (b) may be removed from the fluid ports and interchanged with other connectors and (c) when connected between first and second fluid treatment modules, the first connector allows the feed stream entering the system to pass into the cartridge of the first fluid treatment module and the | a one-piece structure that can: (a) physically, releasably, and fluidly couple a pair of fluid ports on the first fluid treatment module to a corresponding pair of fluid ports on the second fluid treatment module, (b) be installed in the same connection location as the second connector without changing the spatial relationship of the fluid ports on the first head relative to the fluid ports on the second head, and (c) by itself physically |

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | | Date | June 3, 2010 |
|---|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | | |

| | |
|---|---|
| cartridge of the second fluid treatment module simultaneously. | and fluidly connect the first and second fluid treatment modules such that the stream of fluid entering the system is split into two distinct streams with one of the streams passing through only one of the fluid treatment modules, the other stream passing through only the other fluid treatment module, and the two streams recombining into one output stream after exiting the treatment modules. |

The parties dispute three main aspects of the definition of this term: (1) whether the connector needs to connect "by itself" the first and second fluid treatment modules to create parallel flow or whether other structures may (or even must) be involved in the connection; (2) whether the connector needs to be a one-piece structure or can consist of a structure with more than one piece; and (3) whether, in order to constitute parallel flow under the patent, the flow from each of the fluid treatment modules must recombine or whether it may remain separate.[1]

## 1. Must the connector "by itself" connect the first and second fluid

---

[1] In their moving papers, Everpure also disputed two other minor parts of Selecto's definition, but it did not address—and essentially acceded—to Selecto's arguments on these points at the hearing and in the supplemental briefing. *See* Supplemental Briefing at 5 n.4. Namely, Everpure disputed whether "removable and interchangeable," should be interpreted to mean can "be installed in the same connection location as the second connector without changing the spatial relationship of the fluid ports on the first head relative to the fluid ports on the second head," as Selecto contends. The specification supports Selecto's definition. *See* Patent, Col. 14: 5-8 ("Additional plumbing and other fixtures need not be removed or installed in order to change between configurations by virtue (at least in part) upon the *common* module and *port locations* in both configurations." (emphasis added)). The specification also supports Selecto's use of the phrase "releasably fluidly connect" to describe the connection, since the specification uses that exact phrase. Patent, Col. 8: 26-39.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

treatment modules?

Selecto argues that because the claim indicates that the first connector "defines" a parallel configuration, the connector must "by itself" connect the first and second fluid treatment modules. Selecto relies upon the *Agilent* and *C.R. Bard* cases to support its position as to the significance of the patent's use of the word "defining." *Agilent Technologies, Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1375-77 (Fed. Cir. 2009); *C.R. Bard, Inc. v. Medtronic, Inc.*, 140 F. Supp. 2d 346, 348 (D. Del. 2001). Both cases dealt with the interpretation of the word "defining." In *Agilent*, the Federal Circuit held that it was error for the district court to interpret the claim "a first substrate and a second substrate having inner surfaces that define a closed chamber therebetween, said chamber adapted to retain a quantity of fluid" to mean "an enclosed cavity, or some other enclosure or system of enclosures, which is capable of being sealed or set apart from its surroundings to retain a quantity of fluid." *Agilent*, 567 F.3d at 1375-77. Instead, the court found that the claim meant "an enclosed cavity defined by the inner surfaces of the first and second substrates, from which there is no egress of fluid." *Id.* In reaching its holding, the court reasoned,

> The claim itself recites a closed chamber "define[d]" by "a first substrate and a second substrate having inner surfaces." Thus, the claim requires that the chamber be bounded by two discrete substrates. The chamber is not a nebulous space that could ambiguously span a "system of enclosures." Instead, it is an enclosure explicitly defined by two surfaces.

*Id.* at 1376. The *C.R. Bard* case also makes clear that "defining" cannot mean merely "allowing." The Federal Circuit's decision in *C.R. Bard* was unpublished but is quoted in a subsequent district court opinion. *C.R. Bard*, 140 F. Supp. 2d at 348. The district court notes that the Federal Circuit held that its interpretation of "a housing defining a substantially toroidal flow path" to mean "that the housing (although not necessarily toroidal in shape) must determine with precision a fluid flow path having the shape of a substantially closed curve which rotates about, but does not intersect or contain, an axis in its own plane" was erroneous. *C.R. Bard*, 140 F. Supp. 2d at 348. The Federal Circuit construed "the 'housing' limitation as requiring that the housing itself be toroidally shaped." *C.R. Bard, Inc. v. Medtronic, Inc.*, 250 F.3d 760, at * 3 (Fed. Cir. 2000) (unpublished table disposition). Everpure tries to distinguish these cases, arguing that

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

they are limited to their facts, but the phrasing of the claim terms here is strikingly similar to that in those cases.

In short, Federal Circuit decisions support the proposition that "defining" should mean more than "allowing." Selecto asserts that these cases suggest that here the first connector must "by itself" connect the first and second treatment modules in a parallel configuration. As Everpure pointed out in its moving papers and at the hearing, a connector between the modules cannot "by itself" create a system of parallel flow since other portions of the system (such as plugs 136g and 136b on the outsides of the modules in Fig. 2A) will be required to complete the system. *See* Transcript at 101:15-102:2 (testimony of Mr. Cartwright that a connector does not need to constitute parallel flow by itself). However, as Selecto argued at the hearing, a skilled artisan refers to the connection between two modules when describing a flow system, not extraneous plugs. *See* Transcript at 76:18-77:13 (testimony of Mr. Tadlock describing connectors 3A/3B and 3O/3P as defining a parallel flow configuration based on their connection between the modules alone). Moreover, this problem can be accounted for by clarifying that the connector "by itself (<u>notwithstanding any plugs necessary to close the system</u>)" establishes parallel flow.

### 2. <u>Must the connector be a one-piece structure?</u>

Even though the Patent indicates that the connector must by itself establish parallel flow, that does not necessarily mean that the connector must be a one-piece structure, as Selecto argues.[2] *See* Selecto's Post-Hearing Brief at 1. The specification does not speak directly on this point.[3] It does provide illustrations of embodiments of connectors—Figs.

---

[2]Selecto tries to extend its argument about the meaning of "defining" beyond the context of whether the connector must "by itself" create a parallel flow system into the question of whether the connector may be a multi-piece structure. Selecto offers no support for the proposition that a multi-piece structure cannot "define" parallel flow.

[3]To support its position that the connector need not be a one-piece structure, Everpure cites to text in the specification, which states, "Although both fluid lines need not necessarily be defined in the same body or part . . . , a single connector element 136a can simplify assembly and disassembly while also reducing the number of parts of the

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

3A-3P—several of which are multi-piece structures. *See, e.g.*, Figs. 3J and 3L. Likewise, both experts testified at the hearing that certain of the connectors described in the specification are not one-piece structures. Transcript at 101:3-14; 72:2-7. However, the issue is not whether the generic connectors mentioned in the specification are one-piece structures. The issue is whether the *claimed* "first connector . . . defining a parallel flow configuration," Patent at Col. 19: 57-61, is a one-piece structure. "[T]he claims of the patent need not encompass all disclosed embodiments." *TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008). However, a court should avoid excluding disclosed embodiments in the absence of clear intrinsic evidence to support their exclusion. *See Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification.").

Here, the Patent discloses several connectors, including Figs. 3J and 3L, which both Mr. Tadlock and Mr. Cartwright agree are multi-piece structures. Transcript at 101:3-14; 72:2-7. The only possible textual basis for finding that the connector must be a single-piece structure is that the claim itself refers to "*a first connector and a second connector, each being removable and interchangeable*." Patent at Col. 19:57-58 (emphasis added). But this statement only implies that the connector must be a single structure, not that it necessarily needs to be a one-piece structure. In the absence of clear evidence that the claimed connector must be a one-piece structure, the Court declines to exclude these illustrated embodiments.

Thus, the Court finds that the first connector may be a "one-piece or multi-piece structure."

3. Must the fluid output from each fluid treatment module recombine in order to constitute parallel flow?

Everpure argues, relying on the testimony of its expert, Mr. Cartwright, that streams that have been separated need not be recombined to create parallel flow. He

system . . . ." Patent at Col. 8:48-53. However, this statement is referring to the advantages of a particular embodiment of a connector (136a) over a multi-piece system. It does not speak to whether the *claimed* first connector must be a one-piece structure.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

testified at the hearing that a system containing multiple fluid treatment modules must be configured in either parallel or series—no other configurations are possible. Transcript at 87:22-88:5. He testified that anybody skilled in the art would consider Figure 6 in the specification—which illustrates a configuration in which the fluid flows through both fluid treatment modules concurrently but does not recombine— to be an example of parallel flow. *Id.* at 102:12-103:15.

However, extrinsic evidence may not be employed to contradict intrinsic evidence, including the specification. *See Vitronics*, 90 F.3d at 1584 n.6; *Phillips*, 415 F.3d at 1318. Moreover, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. Here, in the portion of the patent that describes flow, each of the figures described—except for Figure 6—is referred to as an example of either "parallel" flow or "series" flow. *See* Patent at Col. 11:49-13:3. The section of the patent describing the flow through Figure 6 characterizes Figure 6's flow as neither "parallel" flow nor "series" flow, but instead as "yet another example of the various manners in which the system can be configured by virtue of the modular nature of the assemblies." Patent at Col. 12:56-58. This is the only passage in the discussion of flow where a given figure's flow is not described as either "parallel" or "series." *See* Patent at Col. 12:29 (describing Figure 2A as a system in which the assemblies are connected in parallel); 12:30 (describing Figure 4 as a system in which the assemblies are connected in series); 12:52-54 (describing Fig. 5 as a system in which the assemblies are connected in series). The specification clearly contemplates Figure 6 as illustrating neither parallel nor series flow, but something else entirely. The distinguishing feature between Figures 2A (parallel flow) and 6 is that the separated flow streams do not recombine in Figure 6. Tadlock Reply Decl. ¶ 4. As the specification and Mr. Tadlock's testimony establish, the Patent contemplates parallel flow to require a re-combination of the separated fluid streams.

### 4. Conclusion

For these reasons, the Court interprets "a first connector . . . being removable and interchangeable . . . defining a parallel flow configuration" to mean

a one-piece or multi-piece structure that can: (a) physically, releasably,

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

and fluidly couple a pair of fluid ports on the first fluid treatment module to a corresponding pair of fluid ports on the second fluid treatment module, (b) be installed in the same connection location as the second connector without changing the spatial relationship of the fluid ports on the first head relative to the fluid ports on the second head, and (c) by itself (notwithstanding any plugs necessary to close the system) physically and fluidly connect the first and second fluid treatment modules such that the stream of fluid entering the system is split into two distinct streams with one of the streams passing through only one of the fluid treatment modules, the other stream passing through only the other fluid treatment module, and the two streams recombining into one output stream after exiting the treatment modules.

C.      "A Second Connector . . . Being Removable and Interchangeable . . . Defining a Series Flow Configuration"

The following chart contains both parties' interpretations of the disputed term "a second connector . . . being removable and interchangeable . . . defining a series flow configuration."  Patent at Col. 19:57-62; 20:43, 49.

| Everpure's Interpretation | Selecto's Interpretation |
|---|---|
| One or more structures that (a) are capable of connecting one component of a fluid treatment system to another component of a fluid treatment system, (b) may be removed from the fluid ports and interchanged with other connectors and (c) when connected between first and second fluid treatment modules, the first connector allows the feed stream entering the system to first pass into the cartridge of the one of the fluid treatment modules and the outlet flow of the cartridge of that fluid treatment module to then pass into | a one-piece structure that can: (a) physically, releasably, and fluidly couple a pair of fluid ports on the first fluid treatment module to a corresponding pair of fluid ports on the second fluid treatment module, (b) be installed in the same connection location as the first connector without changing the spatial relationship of the fluid ports on the first head relative to the fluid ports on the second head, and (c) by itself physically and fluidly connect the first and second fluid treatment modules such that the entire stream of |

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

| | |
|---|---|
| the cartridge of the other fluid treatment module. | fluid passes first through one of the fluid treatment modules and upon exiting this treatment module the entire stream passes through the other fluid treatment module. |

The parties' disputes over the definition of the second connector are identical to their first two disputes with respect to the definition of the first connector in section B, *supra*. The parties agree on the substance of what series flow means, although they phrase their interpretations slightly differently.[4] Figure 4 exemplifies how the patent defines series flow configuration. *See* Patent at Col. 12:7-29. For the same reasons set forth above in the discussion of the first connector in section B, the Court construes "a second connector . . . being removable and interchangeable . . . defining a series flow configuration" to mean

> a one-piece or multi-piece structure that can: (a) physically, releasably, and fluidly couple a pair of fluid ports on the first fluid treatment module to a corresponding pair of fluid ports on the second fluid treatment module or plug one or more of these ports,[5] (b) be installed in the same connection location as the first connector without changing the spatial relationship of the fluid ports on the first head relative to the fluid ports on the second head, and (c) by itself (notwithstanding any plugs necessary to close the system) physically and fluidly connect the first and second fluid treatment modules such that the stream[6] of fluid

––––––––––––––––––

[4]At the hearing, the Court proposed a hybrid of the two parties' definitions of series flow, which both sides agreed to. *See* Everpure's Supplemental Brief at 6 n.5; Selecto Supplemental Brief (not disputing the Court's proposed definition of series flow).

[5]The addition of the phrase "or plug one or more of these ports" is necessary to describe a series flow configuration like Figure 4, where two of the ports are plugged.

[6]The Court deleted the modifier "entire" preceding "stream" in Selecto's definition because, as Mr. Cartwright explained in his Reply Declaration at ¶¶ 19-20, certain types of filters that the specification teaches may be employed in the cartridges (e.g., hollow fiber filters and reverse osmosis filters), Patent at Col. 7:48-60, do not allow for the entire

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

entering the system passes first through one of the fluid treatment modules and upon exiting this treatment module the stream passes through the other fluid treatment module.

**D.    "The First Orientation and the Second Orientation Each Allowing Both Parallel Flow and Series Flow with the Second Head"**

The following chart contains both parties' interpretations of the disputed term "the first orientation and the second orientation each allowing both parallel flow and series flow with the second head."  Patent at Col. 20:3-5.

| Everpure's Interpretation | Selecto's Interpretation |
|---|---|
| Each one of the first and second orientations of the first head is capable of permitting (a) the feed stream entering the system to pass into the cartridge of the first fluid treatment module and the cartridge of the second fluid treatment module simultaneously (i.e., parallel flow) and (b) the feed stream entering the system to first pass into the cartridge of one of the fluid treatment modules and the outlet flow of the cartridge of that fluid treatment module to then pass into the cartridge of the other fluid treatment module (i.e., series flow). | When the first head is in the first orientation, the first fluid treatment module may be connected to the second fluid treatment module in a parallel flow configuration using the first connector or a series flow configuration using the second connector.  When the first head is in the second orientation, the first fluid treatment module may be connected to the second fluid treatment module in a parallel flow configuration using the first connector or a series flow configuration using the second connector. |

Selecto inappropriately attempts to read the requirements for the first and second connector into the description of the first and second orientations.  This interpretation conflicts both with the claim language as well as the specification.  The court should "look to the words of the claims themselves . . . to define the scope of the patented invention."  *Vitronics*, 90 F.3d at 1582.  The first and second connectors are claimed

stream of fluid to pass into the next cartridge.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|---|---|---|---|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

separately from the orientations and are not referenced in the specification in the phrase describing the orientations. Col. 19:57-62 (connectors); Col. 19:63-20:5 (orientations). Thus, Everpure's definition, which limits its definition to describing the orientations, is preferable. At the hearing, the Court proposed the following definition of the term:

> each one of the first and second orientations of the first head is capable of permitting (a) the fluid stream entering the system to split into two distinct streams with one of the streams passing through only one of the fluid treatment modules, the other stream passing through only the other fluid treatment module, and the two streams recombining into one output stream after exiting the treatment modules (i.e., parallel flow) and (b) the fluid stream entering the system to first pass through one of the fluid treatment modules and upon exiting this treatment module the stream [*sic*] pass through the other fluid treatment module (i.e., series flow).

Selecto did not dispute this definition at the hearing, nor did it dispute it in its supplemental briefing. Everpure disputed only the portion of the definition describing parallel flow based upon its arguments that the Court rejected in Section IV.B.3, *supra*. Thus, the Court adopts the foregoing definition of the term "the first orientation and the second orientation each allowing both parallel flow and series flow with the second head," with the last clause modified for clarity as follows:

> each one of the first and second orientations of the first head is capable of permitting (a) the fluid stream entering the system to split into two distinct streams with one of the streams passing through only one of the fluid treatment modules, the other stream passing through only the other fluid treatment module, and the two streams recombining into one output stream after exiting the treatment modules (i.e., parallel flow) and (b) the fluid stream entering the system to first pass through one of the fluid treatment modules and upon exiting this treatment module to pass through the other fluid treatment module (i.e., series flow).

## V.    CONCLUSION

For the foregoing reasons, the Court construes the disputed terms as described

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2844 AHM (FFMx) | Date | June 3, 2010 |
|----------|----------------------|------|--------------|
| Title | EVERPURE, LLC v. SELECTO, INC. | | |

above.

| | : | |
|---|---|---|
| Initials of Preparer | | SMO |